UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 790 (PKC)

ASA SAINT CLAIR,

Defendant.

------------------------------x

New York, N.Y.
November 13, 2019
12:30 p.m.

Before:

HON. P. KEVIN CASTEL,

District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
KIERSTEN A. FLETCHER
TARA M. LaMORTE
Assistant United States Attorneys

JOHN P. BUZA
Attorneys for Defendant

(Case called)

THE DEPUTY CLERK: For the government.

MS. FLETCHER: Good afternoon, your Honor. Kiersten Fletcher and Tara LaMorte for the government.

THE COURT: Good afternoon to you both.

For the defendant.

MR. BUZA: Good afternoon, your Honor. John Buza for Mr. Saint Clair.

THE COURT: Good afternoon to both of you.

Mr. Buza, has the defendant received the one-count indictment charging him with wire fraud which was docketed under 19 Cr. 790?

MR. BUZA: Yes, Judge. He has received it, he has reviewed it, and I have spoken to him about it.

THE COURT: Does he waive the public reading thereof?

MR. BUZA: Yes.

THE COURT: Mr. Saint Clair, how do you plead to the charge in the indictment?

THE DEFENDANT: Not guilty, your Honor.

THE COURT: A plea of not guilty will be entered on the docket of the Court.

Let me hear from the government. What is the volume of discovery and when do you anticipate discovery to be complete?

MS. FLETCHER: The volume of discovery is quite large

in this case. Prior to the defendant's arrest, the Homeland Security investigation team of agents conducted a search warrant on an apartment that the defendant was residing in. During that search they seized 22 boxes of documents relevant to World Sports Alliance, the entity that the defendant was operating, in addition to about 20 electronic devices. My understanding is that the volume of data just on the electronics is about six terabytes of data that includes several laptops, several tablets and phones.

I have asked Mr. Buza to provide us with a six terabyte hard drive. He has given us the hard drive now. We will begin loading the images of the electronic devices onto the drive, but I expect we will need somewhere in the two- to three-week realm to get Mr. Buza everything that there is.

THE COURT: All right. Mr. Buza, what do you need thereafter? If you get everything as indicated in the next two weeks, you will have it by the end of November. You will need a little bit of time to review it and be in a position to return to advise me whether you have any motions in this case.

How much time do you need?

MR. BUZA: It's difficult for me to give your Honor an honest assessment because I don't understand the nature of the evidence yet. With that said, I spoke to the government and I am going to try to do everything in my power to be able to do that by March 20.

THE COURT: Why March 20? Why so long?

MR. BUZA: My understanding is that we are discussing six terabytes of information. In similar cases where there was voluminous discovery, not quite as much as here, I have typically been in situations where I needed about three to four months to review it, and I just don't want to come back to court and say, Judge, I need more time.

THE COURT: Let me find out from the government.

Six terabytes, what is it? Are they e-mails? Are they account ledgers? What are they?

MS. FLETCHER: So the vast majority of the six terabytes, Judge, is images of electronic devices that were inside the defendant's apartment. So when the agents took the devices, they have created now a forensic copy of the device.

THE COURT: Mirror images of the hard drives?

MS. FLETCHER: Yes, but not so user friendly. That makes it sound like you could just look at it and it would look like a computer, and that's not the case.

Those forensic images need to be run through a forensic tool and analyzed and processed in a way to be able to review them as you would if you were logging on to a computer and looking at the computer. So the copying has happened, but the analysis is ongoing from the government's perspective and won't begin for Mr. Buza until he gets the images. So, presumably, he is going to need to hire someone or work with a

forensic tool in order to be able to look at the data on those devices.

Now, certain devices we have done that. So the defendant consented to a search of his phone. That device has been imaged and a report created and it can be reviewed now. But other devices, which I expect have much more data, are not yet in a reviewable position.

THE COURT: All right. I will set this down then for March 20 at 10:30 a.m., if that's agreeable to the government and to defense counsel.

MS. FLETCHER: It is, your Honor, subject to a motion from the government to exclude Speedy Trial Act time --

THE COURT: We will get to that.

MR. BUZA: That's acceptable to us as well, Judge.

THE COURT: I understand there is an issue also with regard to bail. Maybe you can bring me up-to-date on that.

By the way, March 20 is the date for you to return to court to advise me whether there are any motions you wish to make in this case.

MR. BUZA: Understood, Judge. Thank you.

THE COURT: Where do things stand on the bail situation?

MR. BUZA: If I may, your Honor. I wrote a letter to the Court yesterday and uploaded it on ECF. We are in agreement as to the bail situation at this point. The two

suretors, who are family members of Mr. Saint Clair, have agreed to sign the bond. The only issue is that they are not sufficiently liquid to cover a $500,000 bond. I have given the government the information regarding the primary home of one of the suretors, including the value of the property, the mortgage that's on there, which would give us the equity, and we believe, and the government agrees, that that, in addition to the assets that the two suretors have, would cover the bond of 500,000.

So I request that the Court modify that. The two suretors, one is in Seattle, one is in Irvine, California, but I spoke to them 30 minutes ago and they are ready to sign the bond today. We just need a little bit of time to figure out how it is exactly that one of the suretors is going to put up the property. But we anticipate that that should get resolved by the end of next week.

So the government has agreed to allow for Mr. Saint Clair, assuming the bonds get signed, essentially to be released today with the condition that that property be put up.

THE COURT: I am not sure I understood the latter qualification. Tell me this. What is the relationship between the defendant and the two suretors?

MR. BUZA: One suretor is his ex-wife and her name is Julie Griffin. She lives in Irvine, California. She is a mortgage underwriter. Obviously, they have a sufficiently

close enough relationship that she is willing to do this. She also has a relationship with Mr. Saint Clair's new wife. One of the suretors' daughter is actually in court today; that's Ms. Griffin. The other suretor is his father-in-law, and he lives in Seattle, Washington. And his current father-in-law is the person who has offered to put up the property in Washington.

THE COURT: Let me hear from the government. Is there sufficient moral suasion here that I should be comfortable with these two suretors?

MS. FLETCHER: Your Honor, the government would not approve either of these individuals solely on moral suasion grounds. If the Court would like, I can give a little bit of background as to how we came to this bail package to begin with.

THE COURT: Go ahead.

MS. FLETCHER: The initial conditions set by the magistrate judge are: A $500,000 personal recognizance bond, cosigned by two financially responsible persons; the defendant to maintain a residence in the state of Arizona to be approved by pretrial; the defendant to be subject to home detention. I believe there is also a condition that he not travel to or near airports. And then there is some drug testing and mental health treatment conditions, I believe, your Honor.

But the reason those conditions were set -- and when I

say those conditions, I mean conditions that are that strict were set -- was because the government had serious concerns that the defendant was a risk of flight. The defendant was living in an apartment in New York. That apartment was searched when the defendant was out of the country. The defendant returned to the country, was interviewed by the government, indicated that he was going to continue to live in New York, and then within a matter of days, perhaps weeks, the defendant booked a one-way ticket from Los Angeles to Madagascar and was arrested by complaint attempting to board that flight within 48 hours of the time that it was booked. So the government believed that the defendant was a serious risk of leaving the United States.

The fraud here also involves a number of victims, and those victims were induced to invest in this scheme in part based on representations that the defendant made about his relationships with foreign government officials, about his access to large amounts of money. So the defendant proposed a number of cosigners who were not financially responsible shortly after he was arrested, and only after interviewing several individuals did we come to the agreement that these two were at least arguably financially responsible, though not particularly liquid. We agreed to approve them really on the condition that one of them put up some tangible property to secure the bond.

So no, the government does not view either of these individuals as particularly strong moral suasion cosigners. The defendant's daughter very likely would be a strong moral suasion cosigner, but she is, based on our interview of her and our review of her financial documents, is not a financially responsible person. She is a student.

So that's how we got to this point. And I think where we are now, in terms of our agreed-upon proposal for the Court's consideration, is that the Court continue all of the conditions that the magistrate judge set and require that those conditions all be met before the defendant's release. What I understand Mr. Buza to be saying is that all of those conditions can be met today so his client can be released today. And then to ask the Court to impose one additional condition, which is the security, the defendant's father-in-law to post his home as security for the bond. But that condition can be met by next Friday the 22nd.

THE COURT: You agree with the government's summary, Mr. Buza?

MR. BUZA: I agree with the facts as they transpired that the government elicited. However, there is an explanation that, if the Court would permit, I can proffer as to the issues associated with Mr. Saint Clair and when he was apprehended.

First, he is, as the Court can see from the order from the magistrate, he is actually domiciled at this point in

Arizona. He was in the process of moving there and that's where his current wife is. So to the extent that the government alleges that there appears to have been some semblance of flight issue associated with that, he was in the middle of a move to Arizona.

THE COURT: I didn't hear that from the government. I heard that he bought a one-way ticket to Madagascar, not to Arizona.

MR. BUZA: I can address that point second, Judge.

With regard to the Madagascar point, my client is the president of the WSA, which is a UN affiliated organization that, in short, they sponsor sporting activities throughout the world. Pursuant to his job there he travels the world, and my client informs me that, when you're doing business in Africa, it's very difficult to figure out exactly how long you are going to be there and the circumstances of your return. So it is my understanding commonplace to buy one-way tickets when you travel to places like Africa to do this kind of business, because you're dealing with governments that are not necessarily, for lack of a better schedule, oriented. So it's common practice to buy one-way tickets.

THE COURT: Does the U.S. have an extradition treaty with Madagascar?

MS. FLETCHER: I don't believe that we do, your Honor.

MR. BUZA: If I may, your Honor. I don't think that

there was any allegation that my client has any ties to Madagascar or, quite frankly, really to any country. He was born in the United States. He is an American. The government wanted this bond. We are doing everything we can to facilitate it.

THE COURT: All right. Thank you.

Let me be very clear. I am in a position where no party seeks any modification of the bond set by the magistrate judge, except the government wants me to add the condition that the father-in-law post his home by November 22nd as an additional condition, and I will do that. And provided the conditions set by the magistrate judge are met, the defendant may be released. And that's all I will say at this stage.

I will hear the government's final application.

MS. FLETCHER: Thank you, your Honor.

The government moves to exclude Speedy Trial Act time between today's date and March 20, 2020. The government submits that that exclusion of time is in the interests of justice, to allow the government to produce discovery and give defense counsel an opportunity to review it and contemplate any motions in advance of that conference.

MR. BUZA: No objection, Judge.

THE COURT: I find that the ends of justice will be served by granting a continuance to March 20 and that the need for a continuance outweighs the best interests of the public

and the defendant in a speedy trial. The reasons for my finding are that the time is needed to enable the government to complete the production of discovery materials, which are said to amount to six terabytes of data, for defense counsel to review the discovery materials and to be in a position to return to court to advise the Court whether there are any motions the defendant wishes to make, and accordingly the time between today and March 20 is excluded under the Speedy Trial Act.

Anything further from the government?

MS. FLETCHER: No. Thank you, your Honor.

THE COURT: From the defendant.

MR. BUZA: Thank you, your Honor. No.

THE COURT: Thank you.

(Adjourned)