UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                     19-cr-790 (PKC)

     -against-

                                                   OPINION AND
                                                      ORDER

ASA SAINT CLAIR,

                        Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.:

          A superseding indictment (the "Indictment;" Doc 62) charged defendant Asa Saint Clair with one count of wire fraud. Specifically, Saint Clair was charged with participating in a scheme to defraud investors in a cryptocurrency, "IGObit," by making material misrepresentations to investors regarding the relationship between the purported intergovernmental organization launching IGObit, the World Sports Alliance ("WSA"), and the United Nations ("UN").

          Following an approximately one-week jury trial, Saint Clair was found guilty on the sole count of wire fraud. Before the Court are defendant's motions for acquittal or, alternatively, a new trial. Rules 29 & 33, Fed. R. Crim. P. For reasons to be explained, the motions will be denied.

     I.     Saint Clair's Rule 29 Motion for Judgment of Acquittal

          Saint Clair asserts that the evidence produced at trial was insufficient to support a conviction on the charge of wire fraud on three grounds: (1) the government failed to prove that Saint Clair made false or misleading statements to investors regarding WSA's relationship with

the UN, (2) the government failed to prove that Saint Clair's actions were not done in good faith, and (3) the government failed to prove that the investor money spent by Saint Clair was not his earned income.

    A. <u>Legal Standard.</u>

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In reviewing such a motion, the court "must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." <u>United States v. Anderson</u>, 747 F.3d 51, 60 (2d Cir. 2014) (internal quotation marks omitted). A court must "defer[ ] to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence." <u>United States v. Jones</u>, 482 F.3d 60, 68 (2d Cir. 2006); <u>United States v. Florez</u>, 447 F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge."). "The court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." <u>United States v. Guadagna</u>, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotations and citations omitted). The court must deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Aguilar</u>, 585 F.3d 652, 656 (2d Cir. 2009) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)).

In order to prove a defendant guilty of wire fraud, the government must establish the existence of a scheme to defraud, that money or property were the object of the scheme, and that defendant used interstate wires in furtherance of that scheme. See <u>United States v. Shellef,</u>

507 F.3d 82, 107 (2d Cir. 2007).  A fraudulent intent is essential to proving a scheme to defraud.  United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994).  But direct proof of defendant's fraudulent intent is not necessary; rather, "[i]ntent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false."  Guadagna, 183 F.3d at 130 (2d Cir. 1999).  While a defendant's good faith is a defense to the charge of wire fraud, a belief that investors would ultimately make money from the fraudulent scheme does not absolve a defendant of the requisite intent to defraud established by proof of knowingly made misrepresentations.  See United States v. Ferguson, 676 F.3d 260, 280 (2d Cir. 2011); United States v. Shkreli, 779 Fed.Appx. 38, 40 (2d Cir. 2019).

> B. A Reasonable Jury Could Find that Saint Clair Made Materially False or Misleading Statements Regarding WSA's Relationship with the UN.

Saint Clair first urges that the government's evidence was insufficient to prove beyond a reasonable doubt that he made materially false or misleading statements to investors regarding WSA's relationship with the UN.  In general, Saint Clair argues that he did not lie or make misrepresentations to investors because, according to Saint Clair, WSA was in fact affiliated with the United Nations.  Saint Clair argues that the witness testimony that WSA had neither "observer status" nor "consultative status" with the UN, along with evidence of the cease-and-desist letter sent by the UN legal department to WSA in September 2018, were not dispositive of the question of whether Saint Clair misled investors regarding WSA's relationship with the UN.  Saint Clair further contends that the defense proactively established proof of a relationship between the UN and WSA by offering evidence of WSA's activities with the UN Mine Action Services, UN records referencing WSA, and testimony from Alfred Berkeley III

regarding the UN's relationship with private charitable organizations and its sustainable development goals.

Saint Clair, however, understates the breadth and depth of evidence presented by the government that tended to prove that Saint Clair made materially false and misleading statements to investors regarding WSA's relationship with the UN. Indeed, on the evidence of record a reasonable juror could have concluded that Saint Clair falsely misrepresented WSA's relationship with the UN to IGObit investors.

The government presented evidence of several instances of Saint Clair representing to IGObit investors that WSA was closely affiliated with or a partner of the United Nations. Indeed, the government elicited testimony that Kyle Zukowski and Tamara Lowrimore, two IGObit investors, were told that WSA was "affiliated" with the United Nations (Tr. 51, 588, 590), and introduced documents containing various representations by WSA regarding its allegedly close relationship with the UN, such as representations that WSA was a partner of the UN (Tr. 618; GX 1628 at 3; GX 1629 at 5; GX 2801; GX 2337 at 32) and that WSA was formed within the UN (Tr. 614-21; GX 333 at 3; GX 334 at 2; GX 1620 at 4).

The government also introduced evidence that illustrated the misleading nature of these representations made to IGObit investors. A UN witness testified that the UN's "primary way" of affiliating itself with another intergovernmental organization is by granting the intergovernmental organization "observer status," which WSA did not have. (Tr. 205-06.) Another witness from the UN testified that the UN also engages in formal affiliations with non-governmental organizations by granting them "consultative status," which WSA also did not have. (Tr. 293, 297-98.) The government also introduced the cease-and-desist letter sent by the UN to WSA. In that document, the UN legal department states, among other things, that WSA's

4

representations regarding its relationship with the UN were "misleading to the public." (Tr. 304-307, 622-23; GX 1604 at 2; GX 2705; GX 2707.)

Further, the government provided evidence of statements made by Saint Clair and others affiliated with WSA wherein those individuals admitted that WSA maintained a tenuous relationship with the UN if any at all. For example, the government introduced evidence that in July 2017, Ralph Faraggi, WSA's then-Executive Director, told a reporter that WSA was "not affiliated with the UN." (Tr. 315-317; GX 1609, 1609-A.) The jury also had before it Saint Clair's own statements made in July 2018 to the then-President of WSA in which Saint Clair acknowledged that the WSA "lack[ed] [ ] UN affiliation" (Tr. 621-22; GX 1601), and Saint Clair's own statements made in fall 2019 to prosecutors that when he joined WSA, the organization "was on the outs with the UN and [ ] the relationship had grown cold" (Tr. 650) and that "WSA was not welcome at the UN" (Tr. 647). The government elicited on cross-examination of Saint Clair testimony that WSA had "no affiliation" with the United Nations (Tr. 958-59). Anthony Tijero, a former WSA employee, also testified that WSA had a "strained" relationship with the UN at the time Saint Clair was inducing investors to purchase the convertible promissory notes tied to IGObit. (Tr. 441-42.)

Thus, there was ample evidence to permit a reasonable jury to conclude that Saint Clair represented to IGObit investors that WSA was a "partner" or "affiliate" of the UN and operated "within" the UN. And there was sufficient evidence to permit a reasonable jury to conclude that such representations were false and misleading.

Saint Clair claims that WSA's involvement with the UN's landmine removal campaign definitively established that his representations to investors regarding WSA's relationship with the UN were true. But the landmine-related activities between WSA and the

5

UN occurred in the spring of 2019, while the misrepresentations to investors are alleged to have been made in 2017 and 2018. Based on this evidence, the jury could have reasonably concluded that WSA's landmine removal activities were immaterial to the question of whether Saint Clair's statements to IGObit investors were false or misleading at the time Saint Clair solicited the investments.

Finally, the testimony of Alfred Berkeley III is not sufficient to overcome the other evidence that could reasonably lead a rational jury to the inference of guilt. Most notably, Berkeley's testimony did not directly discuss any relationship between WSA and the UN. (Tr. 798-801.) Rather, Berkeley testified regarding various internal UN procedures and the work performed by his private organization in conjunction with WSA to further sustainable development goals. (Tr. 788-800.) The jury was free to give this testimony the weight it deemed appropriate in consideration of all other evidence.

### C. A Reasonable Jury Could Find that Saint Clair's Actions Were Not Done in Good Faith.

Saint Clair next argues that there was insufficient evidence to allow a reasonable jury to conclude that Saint Clair's actions were not done in good faith. In sum, Saint Clair argues that he acted in good faith and did not intend to defraud the IGObit investors because he intended to repay the investors at the time of making the representations regarding the WSA-UN relationship and worked long hours thereafter in an effort to make IGObit a success but was derailed by unforeseen circumstances.

To support this claim, Saint Clair points to the cross-examination of Tijero, wherein Tijero testified that he and Saint Clair worked "13-hour days, 6-7 days per week" to issue the IGObit cryptocurrency and support the goals of WSA, and that various problems such as infighting at WSA contributed to the delay in the launch of IGObit. (Tr. 473-74.) The launch

6

of IGObit was also apparently delayed by the unforeseen dissolution of a sponsorship that provided a stream of income to WSA. (Tr. 888-891.) In addition, Saint Clair cites to Berkeley's testimony that Saint Clair sought Berkeley's advice on launching the cryptocurrency to best align with the goals of the UN (Tr. 788-89), and notes that WSA did eventually launch a cryptocurrency, though under the rebranded name "GUMMEE" (Tr. 902-05). Finally, Saint Clair argues that his actions were in good faith because he executed with each IGObit investor a promissory note upon which each investor could sue Saint Clair for repayment if Saint Clair failed to repay in accordance with the notes' terms (Tr. 828-32); Saint Clair contends that this shows his good faith because he gave the investors the means to hold him accountable for repayment.

But Saint Clair's arguments miss the mark. Saint Clair's good faith vel non is properly assessed at the time of his representations to an investor. His hard work to make the investment succeed and his willingness to enter into a document providing legal recourse for the investment are relevant to his state of mind but they are not dispositive. No matter the amount Saint Clair worked to achieve the goals of WSA and no matter the belief he held regarding IGObit succeeding as an investment, "where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse." United States v. Rossomando, 144 F.3d 197, 201 (2d Cir. 1998); see also United States v. Lange, 834 F.3d 58, 79 (2d Cir. 2016); United States v. Shkreli, 779 Fed.Appx. 38, 40 (2d Cir. 2019); United States v. Ferguson, 676 F.3d 260, 280 (2d Cir. 2011). A reasonable jury could therefore conclude, based on the previously discussed evidence of misrepresentations regarding the WSA-UN relationship made to IGObit investors to secure their investments in the convertible notes (Part I.B, supra),

that Saint Clair intended to defraud those investors within the meaning of the wire fraud statute. There is no basis to grant a judgment of acquittal on this asserted ground.

### D. A Reasonable Jury Could Find that the Money Received by Saint Clair Was Not Earned Income.

Finally, Saint Clair asserts that the government failed to prove that the money he received from IGObit investors was anything other than money that he lawfully earned for his efforts on the investors' behalf. The Court concludes that there was ample evidence that would permit a reasonable jury to conclude that the funds Saint Clair received and spent on his personal expenses were the end-product of the fraud he committed on investors.

Saint Clair contends that the evidence showed that investors were aware that their investment funds may be used for WSA employee salaries and other "general expenses" of WSA. To support this claim, Saint Clair relies on the testimony of Tijero and a provision of the IGObit Whitepaper stating that investor funds may be used for "general WSA expenses." (Tr. 385, 421.) Saint Clair also notes that, according to the government's financial forensics witness, Saint Clair received approximately $475,000 in compensation over a three-year period (Tr. 700-29), which amounts to approximately $50 per hour assuming Saint Clair worked 60 hours per week and which Saint Clair submits is reasonable compensation for his work.

Nevertheless, there was sufficient evidence for a reasonable jury to conclude that investor funds were wrongfully used by Saint Clair outside the scope of uses disclosed to investors. Notably, the Whitepaper did not specify that investor funds could be used to pay salaries or personal expenses; rather, it specified only that investor funds could be used to pay "general WSA expenses." (Tr. 421-22.) The evidence showed that the investor funds were diverted to Saint Clair's personal bank account and private investment vehicle, Taurino Capital, and used for purchases including Airbnb rentals, meals at high-end restaurants, and personal gym

memberships. (Tr. 694-95, 709-20.) Further, Saint Clair himself testified that under the terms of his employment agreement with WSA, he was not entitled to receive a salary until he raised $2 million in investment funds for WSA, which was never achieved. (Tr. 845-46, 980-90.) The employment agreements also showed that Saint Clair agreed to forego compensation if WSA lacked sufficient funds to pay his salary. (Tr. 980-90.) Based on this evidence, a reasonable jury could have concluded that the investor funds spent by Saint Clair did not consist of earned income.

For these reasons, Saint Clair's Rule 29 motion for a judgment of acquittal is denied.

II.     Saint Clair's Rule 33 Motion for a New Trial.

Saint Clair also moves for a new trial under Rule 33. Saint Clair argues for a new trial on one ground: that the testimony of Georgianna Daniels and Mei Hwang was improperly admitted under Rule 404(b) because neither witness provided testimony that was probative of Saint Clair's intent or absence of mistake in the present case. For reasons to be explained, defendant's motion will be denied.

A. Legal Standard.

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Although granting such a motion is in the court's discretion, "that discretion should be exercised sparingly." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992); accord United States v. Archer, 977 F.3d 181, 187 (2d Cir 2020). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been

9

convicted." United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) (citations and internal quotations omitted).

Generally, a court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001). But "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable" and "must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." Archer, 977 F.3d at 189–90 (internal quotation marks omitted).

### B. The Testimony of Georgianna Daniels and Mei Hwang Was Properly Admitted Under Rule 404(b).

At the final pre-trial conference held on March 2, 2022 (Doc 79), the Court ruled that evidence of individuals who had previously lost money on investments made with Saint Clair may be admitted at trial for the purpose of showing Saint Clair's intent or absence of mistake in connection with the conduct charged in the present case. That evidence was offered at trial in the form of testimony by Georgianna Daniels and Mei Hwang. Saint Clair now challenges that testimony as improper under Rule 404(b), contending that the evidence had no probative value with respect to proving Saint Clair's intent or absence of mistake in relation to the conduct charged in the Indictment.

In particular, Saint Clair argues that "the only thing [Daniels' and Hwang's testimony] proved was that both Ms. Daniels and Ms. Hwang made investments that never materialized and that they now blame Mr. Saint Clair for it." (Def. Brief at 12.) Saint Clair submits that the 2008 financial crisis caused the failure to repay Daniels' and Hwang's investments, and asserts that neither witness testified that they were defrauded by Saint Clair,

10

that Saint Clair made misleading statements to them, or that the purpose of the investment was improper.  (Id. at 12-13.)

Under Rule 404(b), prior act evidence "is not admissible to prove the character of a person in order to show action in conformity therewith[,]" but "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  Courts in this Circuit apply an "inclusionary approach" with respect to Rule 404(b), whereby prior act evidence "is admissible for any purpose other than to show a defendant's criminal propensity."  United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990).  In United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992), the Second Circuit summarized the steps a court takes in determining the admissibility of evidence under Rule 404(b):

> "First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity. If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant, whether its probative value is substantially outweighed by the danger of unfair prejudice. Finally, upon request, the district court must give an appropriate limiting instruction to the jury."

Here, the government offered the testimony of Daniels and Hwang as evidence tending to show Saint Clair's intent and absence of mistake; that is, to show that Saint Clair intended to defraud the IGObit investors or did not make an innocent mistake with respect to his solicitation of investments in IGObit and promises of outsized returns on those investments.  The Court instructed the jury during the testimony of Daniels and Hwang that their testimony was offered for a limited purpose only, that is, as evidence of "the defendant's intent at the time of the charged acts" and that it may not be considered for any other purpose, and the Court reiterated this instruction during the jury charge.  (Tr. 221, 528, 1102, 1108.)

11

Saint Clair's argument that the testimony was offered as impermissible propensity evidence fails.  Daniels testified that Saint Clair solicited her for investment in two early-stage companies: Devinix and Ipaymex.  She testified that she invested $50,000 in Devinix pursuant to a promissory note under which Saint Clair promised to provide Daniels repayment of the $50,000 with interest in monthly installments or shares in Devinix equivalent to her investment upon its initial public offering.  (Tr. 236-44.)  Similarly, she testified that she invested another $50,000 in Ipaymex pursuant to another promissory note under which Saint Clair promised to Daniels repayment of the $50,000 with interest in monthly installments or shares in Ipaymex equivalent to her investment upon its initial public offering.  (Tr. 250-54.)  In both instances, Daniels testified that Saint Clair failed to repay her pursuant to the terms of the promissory notes.  (Tr. 239-48, 251-57.)  Daniels testified that for Devinix she was repaid approximately $5,000 of her initial investment, and for Ipaymex she was repaid nothing.  (Tr. 246, 256.)  She also testified that she never received shares of Devinix nor Ipaymex.  (Tr. 242, 254.)  Daniels stated that on the numerous occasions when she discussed and demanded repayment from Saint Clair, Saint Clair provided various excuses as to why she could not be repaid immediately and reassured her that payments were forthcoming, though the investments were ultimately never repaid.  (Tr. 239-48, 251-57.)

The government elicited similar testimony from Hwang.  Hwang testified that she loaned $250,000 to Saint Clair in 2008 pursuant to a promissory note to invest in a water-treatment company known as "EDN."  (Tr. 527-31.)  Hwang testified that, pursuant to the terms of the promissory note, Saint Clair was to repay Hwang's loan with interest and her investment may, at her discretion, be converted into equity shares of EDN upon its public offering.  (Tr. 532-35.)  Hwang testified that after the maturity date on her promissory note, she demanded

repayment from Saint Clair and he did not repay her but promised that repayment was forthcoming. (Tr. 537-39.) According to Hwang's testimony, she asked Saint Clair for repayment of her $250,000 loan several times over several years after the maturity date on the promissory note, but Saint Clair consistently replied to her requests with various excuses as to why he could not repay her immediately but promised that payments were forthcoming. (Tr. 540-51.) Hwang testified that Saint Clair never repaid any amount of the funds she loaned to him. (Tr. 551.)

In summations the government argued only that the testimony of Daniels and Hwang tends to prove that Saint Clair did not intend to repay the IGObit investors, stating that "[y]ou also know that the defendant never intended to repay [the IGObit investors] because of what you heard from Georgianna Daniels and Mei Hwang" and that "[Saint Clair] never had an intent to pay the IGObit investors either." (Tr. 1051-52.) This is a permissible use of the evidence as proof of intent.

This evidence is also plainly relevant to issues in the case. For example, it provided rebuttal to Saint Clair's contention that he gave promissory notes to the IGObit investors to protect them and therefore did not solicit the investments in bad faith. Indeed, evidence that Saint Clair also gave promissory notes to investors in Devinix, Ipaymex and EDN yet never repaid them is some evidence bearing upon whether Saint Clair intended to repay the investors in IGObit when he solicited their investments. "Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993). The testimony of Daniels and Hwang is relevant

to whether Saint Clair intended to repay the IGObit investors or his failure to do so was the product of misfortune or mistake.

Finally, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. Prior act evidence should be excluded as unfairly prejudicial only where the prior act evidence is "more sensational or disturbing" than the charged crimes. Roldan-Zapata, 916 F.2d at 804. Daniels and Hwang testified to Saint Clair's conduct with respect to Devinix, Ipaymex and EDN that is neither more sensational nor more disturbing than Saint Clair's alleged conduct with respect to IGObit.

For these reasons, Saint Clair's motion for a new trial under Rule 33 will be denied.

CONCLUSION

The Court has considered all of the arguments raised by defendant, including those not expressly addressed herein. Defendant's motions for a judgment of acquittal under Rule 29 and for a new trial under Rule 33 are DENIED. The Clerk is directed to terminate the motion (Doc 87).

SO ORDERED.

Dated: New York, New York
       June 23, 2022

P. Kevin Castel
United States District Judge