UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

UNITED STATES OF AMERICA,

19-cr-790 (PKC)

-against-

OPINION AND ORDER

ASA SAINT CLAIR,

Defendant.

-----------------------------------------------------------x

ASA SAINT CLAIR,

Movant,

25-cv-1046 (PKC)

-against-

UNITED STATES OF AMERICA,

Respondent.

-----------------------------------------------------------x

CASTEL, Senior District Judge

Asa Saint Clair moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Saint Clair has completed his term of imprisonment, and his term of supervised release is set to expire on December 5, 2027. (ECF 141.)

Saint Clair proceeds pro se, and the Court considers his submissions "to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).

## BACKGROUND

A superseding indictment (the "Indictment") (ECF 62) charged Saint Clair with one count of wire fraud. Specifically, Saint Clair was charged with carrying out a scheme to

defraud investors in a cryptocurrency, "IGObit," by making material misrepresentations to investors regarding the relationship between the World Sports Alliance ("WSA"), the purported intergovernmental organization launching IGObit, and the United Nations ("UN") and diverting investor funds for his own benefit.

Following an approximately one-week jury trial, Saint Clair was convicted of one count of wire fraud. The Court denied his motion for judgment of acquittal or for a new trial, concluding that a reasonable jury could find that Saint Clair intended to defraud IGObit investors within the meaning of the wire fraud statute based on the evidence of misrepresentations regarding the WSA-UN relationship. (ECF 105.) The Court sentenced him principally to a below Guidelines sentence of 42 months' imprisonment, three years supervised release, forfeiture in the amount of $618,417, and restitution in the amount of $613,417. (ECF 119.)

Saint Clair appealed, and the Second Circuit affirmed his conviction. United States v. Saint Clair, 22-cr-2100, 2024 WL 413422 (2d Cir. Feb. 5, 2024) (summary order). The Second Circuit concluded that "[d]rawing all permissible inferences and resolving all credibility issues in favor of the government, the evidence at trial established that Saint Clair knowingly made false or misleading statements regarding WSA's relationship with the United Nations [ ] to induce investors to provide funds for the development of IGObit, a cryptocurrency developed by WSA. Several investors testified at trial that Saint Clair's representations regarding WSA's relationship with the UN were material to their decision to invest in IGObit." Id. at *4.

Saint Clair's section 2255 motion raises a host of issues, including ineffective assistance of trial counsel in investigating the case, presenting witnesses and exculpatory information, and in rebutting purported government misconduct. In aid of his motion, he seeks to have the record of grand jury proceedings reviewed and an evidentiary hearing conducted.

For reasons to be explained, the motion will be denied.

DISCUSSION

I. Legal Standard

A person in federal custody may collaterally attack a final judgment in a criminal case based on "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in complete miscarriage of justice.'" Graziano v. United States, 83 F.3d 587, 589–90 (2d Cir. 1996) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995)).[1] Generally, "a defendant is barred from collaterally challenging a conviction under [section] 2255 on a ground that he failed to raise on direct appeal." United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011). Moreover, "a [section] 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal." United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001) (internal quotation marks and citation omitted).

II. Ineffective Assistance of Counsel

On a claim of ineffective assistance of counsel, a defendant must first overcome the presumption of effective representation by presenting evidence that counsel's performance "fell below an objective standard of reasonableness" based on prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 688–90 (1984). Second, the defendant must prove prejudice by showing a reasonable probability that, but for counsel's performance, the result of

[1] Saint Clair was on supervised release when he filed his petition on February 3, 2025. (See ECF 148.) Accordingly, his petition satisfies the in-custody requirement. See Scanio v. United States, 37 F.3d 858, 860 (2d Cir. 1994) (explaining that "a petitioner under supervised release may be considered 'in custody'" for the purposes of section 2255).

the case would have been different. Id. at 693–94. It is insufficient to show that counsel's "errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Instead, the defendant must show "a probability sufficient to undermine confidence in the outcome" of the case. Id. at 694.

"Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting Strickland, 466 U.S. at 689). "Counsel's election to forgo an unsupported argument plainly falls into this category." Id. "Similarly, counsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." Id. (internal quotation marks and citation omitted).

Saint Clair was briefly represented in this action by an attorney associated with the Federal Defenders of New York. Thereafter, Saint Clair retained the services of John P. Buza, an experienced attorney who served as lead trial counsel. (ECF 5.) Following Saint Clair's conviction but prior to sentencing, Buza was replaced by Jonathan A. Rosenberg, retained counsel. (ECF 109.) Rosenberg also represented Saint Clair on his appeal to the Second Circuit.

In connection with his section 2255 motion, Saint Clair signed an Attorney-Client Privilege Waiver. (ECF 140.) Buza subsequently provided an affidavit in response to the section 2255 motion that is 115-paragraphs in length and addresses Saint Clair's principal contentions. (ECF 146-1.)

A. Failure to Investigate the Case; Failure to Interview, Prepare, or Call Witnesses; and Failure to Communicate and Prepare for Trial

Saint Clair argues that his trial counsel was ineffective due to a failure to investigate the case, hire investigators or experts, or issue any subpoenas. He also asserts that

counsel failed to interview or call key witnesses, communicate with him, and generally prepare for trial.

In response, his trial counsel states that "Mr. Saint Clair is an obviously intelligent person who was very active in his defense" and "[e]very decision I made was done in conjunction with him."[2] (ECF 146-1 ¶¶ 11, 13.) Buza notes that "Mr. Saint Clair lived in Arizona, his case was in the Southern District of New York, and most of his witnesses lived thousands of miles from New York." (Id. ¶ 20.) He further explains: "nearly my entire representation of Mr. Saint Clair was during the COVID-19 pandemic when much of the world was shut down." (Id. ¶ 19.) Nonetheless, Buza spoke to many potential witnesses "on the phone, on zoom calls, and on FaceTime." (Id. ¶ 22.)

According to Buza, Saint Clair was fixated on a statement that a prosecutor had made at a pre-trial conference early in the case to the effect that WSA was a sham. (Id. ¶ 25.) But that was not the charge in the indictment nor the government's theory of the case at trial. Apart from the statement at the early conference, the government did not claim that WSA was not a real organization. Rather, Saint Clair was charged with, and the proof at trial focused upon, his misleading statements to investors about WSA's affiliation with the UN and the status of IGObit. Yet Saint Clair, per Buza, "did not acknowledge then and does not acknowledge now that the actual issue at trial, and ultimately the reason he was convicted was because he took money from numerous people who thought they were investing in a cryptocurrency that did not exist." (Id. ¶ 26.) Buza concluded that Saint Clair instead "intended for his federal criminal trial to be about whether WSA was a 'sham' organization or not." (Id. ¶ 27.) "To that end" Saint

---

[2] The assertion that Saint Clair was actively involved in his defense is buttressed by the exhibits to Buza's affidavit. (See ECF 146-1.)

Clair "had a list of witnesses that he wanted to call at the trial that he believed could address this issue." (Id. ¶ 28.)

Buza explains in his affidavit: "Simply put, I did not think it was a viable defense strategy to call Mr. Saint Clair's friends to impugn the credibility of actual employees of the UN when the facts that I wanted to elicit about the relationship between the UN and WSA could be elicited through my cross-examination of them." (Id. ¶ 67.) He reports that he and Saint Clair "had lengthy conversations about this issue, and he agreed with this strategy." (Id. ¶ 68.)

Indeed, on cross-examination at trial, Saint Clair abandoned any claim that WSA was affiliated with the United Nations. He admitted that WSA had "no affiliation" with the United Nations. (Trial Tr. 959.) He testified that he never told investors that WSA was affiliated with the UN because that would have been untrue:

> Q. You never told investors that WSA had no affiliation with the United Nations, you did not tell the investors that, did you?
>
> A. No, I never said we had an affiliation with the United Nations.
>
> Q. Right. No. That answers the question.
>
> A. That would have been an untrue statement to say we had an affiliation with the United Nations.
>
> Q. And just to clarify, Mr. Saint Clair, if you told an investor that WSA was affiliated with the United Nations, that would be untrue; correct?
>
> A. Correct.

(Trial Tr. 961.)

The Second Circuit has held that deciding not to call certain witnesses, "even ones that might offer exculpatory evidence[,]" is generally "not viewed as a lapse in professional representation." Best, 219 F.3d at 201 (internal quotation marks and citation omitted). The

decision not to call the potential witnesses named by Saint Clair fell squarely into the arena of tactical decisions of counsel. See United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999) (internal quotation marks and citation omitted) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.").

For example, Saint Clair has submitted a declaration from Lyle Wallace of Edmonds, Washington, who declares that he stayed at "the WSA apartment" across from the United Nations in New York with Saint Clair for about eight months paying no rent but "footing the grocery bill." (ECF 135 at 70–74.) His vague impressions of Saint Clair's nexus to the UN would have added little to the trial. He states: "[b]ased upon what I know to be true, Mr. Saint Clair worked long and hard on the project and I had knowledge that he did indeed work with the UN or with people who worked at the UN, had been inside of the UN, etc." (Id. at 74.) The fact that Saint Clair did work with the UN or people who worked at the UN or had been inside the UN does not meet the substance of the government's theory of the case, namely that the statements made to investors in words or substance that WSA was affiliated with the UN were not true, which Saint Clair acknowledged at trial.

Similarly, Karine Shufford, who resides in Fort Worth, Texas and has worked closely with the government of the Democratic Republic of Congo, declares that she has known Saint Clair since March 2019. (Id. at 67.) Shufford states that it is her "understanding that WSA works with the UN." (Id.) Shufford also states: "On my way to the airport, I received a phone call from Mr. Saint Clair. As a result of this call, I cancelled my airline ticket to New York and did not testify. My impression was that Mr. Saint Clair's lawyer did not want me to testify because of the fact that I am African to which I was greatly offended but not surprised." (Id. at

68.) This was a secondhand "impression" of Buza's strategy or beliefs. Indeed, there is nothing in Shufford's declaration to suggest that the "impression" came from anything Buza said or did of which Shufford had direct knowledge. Shufford's declaration in fact supports Buza's claim that Saint Clair was included in strategic decisions, as he was the individual who told Shufford not to travel to New York for trial.

Chantel Soares describes her "impressions" and "understandings" of Saint Clair and her experience in Madagascar, where she has family and colleagues. (Id. at 61–66.) She does not claim to have any knowledge of the representations made by Saint Clair to investors, and her account is of marginal relevance to any issue in the case. She states: "Directly before trial, I was ready to travel from Boston to New York to testify when Mrs. Saint Clair reached out. It was my understanding that I need not travel to New York to participate in the trial. It was my further impression that President Saint Clair's defense attorney did not want me as a witness due to my African heritage." (Id. at 65.) This "impression," based upon a conversation with the wife of the defendant, is entitled to little weight.

Saint Clair has also submitted an unsworn statement from Malick Maachi, Chairman of the WSA Restructuring Board, which describes WSA as "an Intergovernmental Organization organized under the Vienna Convention on the Law of Treaties of 1969." (Id. at 46.) While approximately thirty countries are identified on the letterhead utilized by Maachi, he does not reveal the country in which he resides or whether he had been willing to testify at Saint Clair's trial. He opines that "Mr. Saint Clair lacked the proper representation" and that the Founding Executive Office of the President of WSA "should have participated in the pre-trial investigation process, represented the organization and, actively communicated with Mr. John Buza, or any other of Mr. Saint Clair's defense attorneys." (Id. at 47.) Neither WSA nor any

person other than Saint Clair was charged in the indictment, and Saint Clair's retained trial counsel had no duty to the WSA. Beyond the uncontroverted fact that "Mr. Saint Clair has expended significant time and resources in connection with the creation of the IGOBIT digital offering[,]" there is little to nothing in Maachi's statement that would have been relevant or, if marginally relevant, that would have passed muster under Rule 403, Fed. R. Evid., balancing. (Id. at 46.)

Additionally, Saint Clair has submitted a declaration from Professor Zahid Haque, Secretary-General of WSA, stating that he was not contacted by Buza. (Id. at 48.) Haque does not indicate what he would have said to Buza had he called, or whether he would have voluntarily travelled to New York from his address in Dubai, U.A.E., to testify at trial.

Another declaration attached to Saint Clair's motion comes from Roland Schatz, the founder and President of UNGSII, an organization which supports UN sustainability goals but which, despite the "UN" in its name, is a private foundation. (Id. at 50.) Schatz also served as advisor to UN Director-General in Geneva, Michael Møller. (Id.) Schatz states that he attended a party for the United Nations Mine Action Service ("UNMAS") at which "Saint Clair and multiple UN executives were present." (Id. at 56.) He also met up with Saint Clair in Romania where "the Pope deliver[ed] a speech," after which Schatz "introduced Mr. Saint Clair as the President of WSA to various Government officials and Vatican Staff." (Id. at 57.) He avers that he "know[s] from official UN records that WSA was a real intergovernmental organization," and that he "knew from personal experience that WSA did in fact work with the United Nations." (Id. at 58.) The issue at trial, however, was not whether WSA was "real" or an "intergovernmental organization," or at some point in time "work[ed] with the United Nations."

Schatz also describes his communications with Buza by letter and email. Schatz at one point believed that Buza "was not sincere in defending Mr. Saint Clair[,]" seemingly because he "had a hard time communicating with Mr. Buza" and "played email tag" with him "quite a bit[.]" (Id. at 59.) Notwithstanding his apparent willingness to testify at the trial, Schatz reports that he "got Covid directly the week before Mr. Saint Clair's trial which affected my lungs to such a degree that my doctor advised I travel by plane." (Id.) The proximity of Schatz's illness to the beginning of trial coupled with the marginal relevance of his testimony would have doomed an application to postpone the trial or conduct a de bene esse deposition in Switzerland where Schatz resides.

William North, another declarant and an uncle of Saint Clair, states that "[i]t was [his] impression that [WSA] had some connection with the United Nations." (Id. at 83.) He was also "under the impression that Asa was doing some fundraising for his World Sports organization with cryptocurrency," and "underst[ood]" that Saint Clair "faced some headwinds in trying to launch a cryptocurrency for [WSA]." (Id.) None of these vague statements would have been admissible, or if admissible, would have impacted the trial.

Two other individuals from whom Saint Clair has obtained and submitted statements in conjunction with his section 2255 motion served as defense witnesses at trial: Alfred Berkeley III and Saint Clair's daughter, Mia Saint Clair.

At trial, Berkeley described work performed by non-profit organization UNGSII, operating "outside of the UN budget," and, separately, by the WSA, to further sustainable development goals. (Trial Tr. 783–99.) Berkeley further testified that Saint Clair had sought his advice on launching the cryptocurrency to align with WSA's mission of using "sports as a tool for creating peace." (Trial Tr. 788–90, 1064.) Berkeley's testimony, however, did not directly

touch on any relationship between WSA and the UN. (Trial Tr. 783–803.) In his declaration submitted on this motion, he states that he "spoke with" Buza "[p]rior to coming to New York to testify," and had "emailed Mr. Buza a basic profile about [him]self prior to speaking with him." (ECF 135 at 81.) He describes his pre-trial meeting with Buza as brief and states that he was "taken aback by . . . how few questions" he was asked. (Id.) Berkeley does not identify, however, anything he would have liked to testify about at trial but which he was unable to present.

Mia Saint Clair, the defendant's daughter, testified at trial that she attended a UNMAS event at UN Headquarters where WSA received an award because it had donated soccer turf. (Trial Tr. 807–08.) She states in her declaration on this motion that she has a "good understanding of the UN's operations" from leadership positions in Model United Nations during college. (ECF 135 at 75.) She also states that it was her "understanding that [WSA] was originally formed and was connected to the UN." (Id.) She explains: "Based upon what I saw during my time spent around my father and his dealings with [WSA], my father did not commit fraud." (Id. at 78.) She adds in conclusory fashion: "I believe that I could have offered a great deal more data which would have been helpful to my father's case had things been better planned." (Id.) Ms. Saint Clair, however, is not specific as to what that data or testimony would have been.

Saint Clair's submission, on its face, fails to show that any of his would-be witnesses could have provided material support to the defense case at trial. The declarations of Haque and Schatz, for example, do not show that those individuals would have been willing or able to travel to New York for trial. Other individuals, such as Haque, Mia Saint Clair, and Berkeley, do not reveal the substance of the testimony (or additional testimony) they might have offered. For some, such as Wallace, Shufford, Soares, Maachi, and North, fragments of their

statements might have had some probative value had they been admissible under Rule 403, Fed. Evid. But significantly, several of these witnesses would have contradicted Saint Clair's own trial testimony that WSA had no affiliation with the UN and that he never told investors that there was such an affiliation. During trial, Saint Clair testified as follows:

> Q. Moving forward in time to mid 2017, you were told that WSA had no affiliation with the United Nations; isn't that correct?
>
> A. Please define affiliation.
>
> Q. I'm asking if you were told the words, WSA had no affiliation with the United Nations. Were you told those words in 2017?
>
> A. That is a true statement, yes. We don't have an affiliation with the United Nations.
>
> * * * *
>
> Q. You never told investors that WSA had no affiliation with the United Nations, you did not tell the investors that, did you?
>
> A. No, I never said we had an affiliation with the United Nations.

(Trial Tr. 959, 961.)

In sum, Saint Clair has not shown that his lawyer's decision not to call certain witnesses or cover every imaginable topic in the witnesses' direct testimony fell below an objective standard of reasonableness under prevailing professional norms. See Strickland, 466 U.S. at 688. And given the government's reasonably strong case, coupled with the absence of any evidence that the testimony of the declarants would have aided Saint Clair, the failure to call or examine in greater depth the would-be witnesses cannot be said to have prejudiced Saint Clair.

The government called a forensic banking expert to trace the movement of investors' funds into Saint Clair's personal account. (See Trial Tr. 691–705.) It is a core skill of an accomplished trial lawyer to be able to assess whether it would be better to rely solely on cross-examination of the government's expert or call a defense expert who would be open to both cross-examination and possible rebuttal testimony. Saint Clair has not shown that Buza's

decision to take the former route prejudiced him in any way. As Buza put it, "[t]he evidence that Mr. Saint Clair comingled the investors' money with his own was self-evident and not in dispute." (ECF 146-1 ¶ 111.) The defense strategy was not to rebut that showing but instead to "maintain[ ] that [Saint Clair] had the right to take their money as compensation for his work." (Id. ¶ 113.)

Saint Clair, however, criticizes Buza for declining to call any kind of defense expert at all. The question would be on what subject an expert's testimony would be admissible and useful to Saint Clair's case. Of course, the testimony of any expert whose proposed testimony passed any Daubert or other challenge would likely be met with both cross-examination and a government rebuttal expert. Nothing is presented on the motion with respect to experts beyond the vague and amorphous.

Much the same may be said regarding the hiring of a defense investigator. Saint Clair does not delineate what leads a hypothetical investigator would have pursued. This was not a street crime in which eyewitnesses might differ in their observations and recollections. Rather, it was a fraud to induce investors to part with their money in exchange for promissory notes convertible into a prospective cryptocurrency. The conversations between Saint Clair and the investors were not susceptible to a fruitful investigation, in part because investors who considered themselves to have been defrauded by Saint Clair were not likely to be cooperative with his investigator. As to Saint Clair's actions, Buza "did not believe that a private investigator was necessary because none of Mr. Saint Clair's actions were in dispute." (ECF 146-1 ¶ 114.) That assessment was eminently reasonable.

Saint Clair's allegation that Buza failed to adequately communicate with him is rebutted by the record. Saint Clair lived in Washington state in the lead-up to trial. He chose to

join telephonically a conference before the Court one week from the start of trial. (See ECF 79.) When asked by the Court when he planned to arrive for trial, he responded that he would arrive in New York one day before jury selection, changing his plans only after the Court voiced its concern about the potential of a flight delay impacting the trial. (Id. at 3–4.) This does not describe the actions of a client who craves face-to-face access to his lawyer in the days leading up to trial. Further, the record shows Buza and Saint Clair were nonetheless in regular communication, even if not meeting in person. Buza reports that "Saint Clair spent most of every day dealing with this case while [he] represented him" and that "[e]very decision [he] made was done in conjunction with him." (ECF 146-1 ¶¶ 12–13.) Buza also explains: "[r]egarding Mr. Saint Clair's claim that I did not adequately prepare for him to testify or for cross-examination, this is not true . . . . Mr. Saint Clair and I discussed at length his testimony and the likely cross-examination." (Id. ¶¶ 90–91.)

Finally, Saint Clair's claim that he was denied access to discovery is frivolous. Buza provided Saint Clair with the discovery as the government's rolling production proceeded. Buza also provided Saint Clair with the same discovery on a single hard drive. (Id. ¶¶ 82–89; see also id. ¶¶ 16–18.)

Conclusory claims relating to the investigation of the case, decisions about calling witnesses, trial preparation, and trial strategy by Saint Clair have been met with specific refutations by his trial lawyer. His claims are so filled with generalities and lacking in any persuasive or plausible detail that they do not require a hearing.

B. Counsel's Failure to Rebut Purported Government Misconduct

Saint Clair raises a basket of claims of government misconduct and accuses his counsel of failing to properly address the misconduct. Saint Clair has failed to demonstrate that a prompt and loud outcry by his lawyer would have resulted in any meaningful relief that would have affected the outcome of the trial, which dooms his claim under Strickland.

The first instance of purported prosecutorial misconduct relates to the location of Saint Clair's residence if released on bail. In Saint Clair's telling, the government falsely claimed to have been deceived when it learned he planned to live in Scottsdale, Arizona rather than New York. But Saint Clair was released on bail and lived in Scottsdale. It is hard to see how he was prejudiced by his counsel's failure to counteract the government. Saint Clair hints that because his indictment quickly followed, the government's unfounded belief that it was deceived may have caused his indictment. He now seeks access to the grand jury minutes. There is no nexus between the grand jury minutes and his proposed residence if released on bail. There is no reason to believe that the grand jury failed to hold the government to the requirement that there be probable cause to believe that Saint Clair committed the crime for which the government sought an indictment. The request for a review of the grand jury minutes is, in this instance, a fishing exhibition and is denied. There was no discernable prejudice to Saint Clair that would cause his conviction and sentence to be set aside over disputed claims of where he would live when released on bail.

Saint Clair also complains of a statement by the government in summation that that "when Asa Saint Clair was at the WSA, the closest he got to the UN was having an apartment office across the street." (Trial Tr. 1087.) This rhetorical flourish was arguably excessive but given Saint Clair's concession that WSA had no affiliation with the UN, and the

strength of the government's evidence, Saint Clair was not prejudiced by any shortcomings in his lawyer's endeavors.

Saint Clair next argues that Buza should have objected to the government's cross-examination of him regarding past Financial Industry Regulatory Authority ("FINRA") violations. In 2011, Saint Clair entered a settlement with FINRA based upon FINRA's determination that he had made "false, exaggerated, unwarranted or misleading statements" concerning a securities offering. (See GX S1.) Prior to trial, the government moved in limine to introduce evidence of the settlement to demonstrate absence of mistake and intent. (ECF 50.) Buza vigorously opposed the motion, arguing that the settlement document was hearsay, that introducing it would violate Saint Clair's Confrontation Clause rights, and that its probative value was substantially outweighed by the danger of unfair prejudice. (ECF 52.) The parties eventually agreed to a limited stipulation regarding the FINRA proceeding that was received into evidence as "GX S1." Aware that the FINRA settlement would come up on cross-examination, Buza briefly touched upon it in his direct examination of Saint Clair. (Trial Tr. 833–35, 931–32.) GX S1 was offered in lieu of other documents from the FINRA proceedings but it was not a limitation on the scope of cross-examination. The Court has reviewed the cross-examination of Saint Clair on the FINRA settlement and sees no impropriety nor any line of questioning that could have been foreclosed by a timely objection. The absence of an objection to a repeated question on cross examination on the basis that it had been asked and answered did not prejudice Saint Clair and it was a reasonable strategic choice on the part of his counsel to avoid the appearance that Saint Clair had something to hide.

Saint Clair also challenges statements made by the government in closing argument suggesting that he sped up work on GUMMEE because he was told that a business

associate of his might face charges and because WSA offices had been searched. (Id. at 1054–55.) Saint Clair faults Buza for failing to object on the basis that there was no evidence of such a communication. Saint Clair is incorrect. The government had a sound basis for the argument, namely an August 10, 2019 text message admitted into evidence in which Saint Clair is told by another individual "that the Phoenix team has referred Charles for charges." (See GX 1630.)

Saint Clair next asserts that the government offered an altered version of a document, namely a letter that WSA faxed to the UN in response to its cease-and-desist letter, into evidence. In the cease-and-desist letter, the UN legal department states, among other things, that WSA's representations regarding its relationship with the UN were "misleading to the public." (GX 2705.) The government offered, and the Court admitted, the version of WSA's response that the parties agreed was maintained in the UN files. (See GX 2706; Trial Tr. 304.) There was nothing inappropriate or objectionable in that. That the fax may have cut off some of the document does not speak of misconduct. Furthermore, the version that Saint Clair contends is correct reveals that the missing portion of the document to which he refers is simply a list on the left-hand side of the page, seemingly of WSA members and partners. (See ECF 135 at 154.) The omission was not material.

Saint Clair argues Buza erred in not arguing that his compensation was above board. Saint Clair acknowledges that he was not to receive a base salary until certain capital was raised but contends that he was entitled to receive reimbursements for certain costs, such as moving expenses. (Id. at 41.) Buza simply made a strategic call to not highlight the government's evidence that Saint Clair used investor funds for such items as Airbnb rentals, meals at high-end restaurants, and a personal gym membership. (See Trial Tr. 709–11.)

Saint Clair faults his lawyer for "not clearing the confusion surrounding the [p]olymorphic word 'affiliate,' which had inculpatory consequences for the Defense." (ECF 135 at 42.) He points out that "affiliate" may be used as both a noun and a verb and suggests "that it is not illogical for an organization to choose to not be a UN affiliate (noun) while still choosing to affiliate (verb) with the UN[.]" (Id.) But it was Saint Clair who testified that he never told investors that WSA was affiliated with the UN and that it "would have been an untrue statement to say we had an affiliation with the United Nations." (Trial Tr. 961.) On the heels of his own client's testimony, it likely would have befuddled the jury for Buza to have challenged his own client's adoption of the government's use of the word affiliation.

To the extent Saint Clair seeks to raise the purported instances of government misconduct not as an ineffective assistance claim but as a due process claim, they fail. None of the instances of prosecutorial misconduct alleged by Saint Clair, considered individually or collectively, amount to a violation of the Fifth Amendment's Due Process Clause. Nor have they been shown to have substantially and injuriously influenced the verdict in this case.

C. Purported Failure to Offer Exculpatory Evidence

Saint Clair argues that his counsel should have offered certain exculpatory evidence into the record. As will be explained, that evidence was largely cumulative or immaterial. It was a reasonable strategic decision on the part of Buza not to offer evidence that would merely serve as a distraction.

Saint Clair first argues that a memorandum of understanding executed in 2007 between WSA and UN-NGO-IRENE (the "MOU") should have been introduced. At trial, Saint Clair testified that the "job" of UN-NGO-IRENE "was to reach out . . . and make partnerships in

the private and public sector" and that the organization was "the driving force behind forming [WSA]." (Trial Tr. 870–871.) Introducing the document itself, however, likely would have added little. The Memorandum of Understanding, the MOU, was explored at several points during trial, and UN-NGO-IRENE appears to have been defunct for over a decade by the time of trial. (See Trial Tr. 818–19, 867–68, 870–71, 980; DX 2 at 2.) Moreover, given the passage of time since its creation, the MOU did not necessarily reflect the circumstances during the relevant period. Even so, Buza was able to make effective use of the UN-NGO-IRENE's role in WSA's origins in his closing argument.[3] (See Trial Tr. 1061–62.)

Much the same can be said in response to Saint Clair's argument that a 2017 joint venture agreement between WSA and UNGSII should have been introduced. The document's relevance was marginal at best, particularly because UNGSII is a private group that is not part of the UN. The testimony at trial and Saint Clair's exhibits on this motion reveal that it is a "third-party group of economists and analysts that were going to basically vet . . . every single publicly-traded company that was on . . . large exchanges . . . [to] verify not only are they profitable and ethical, but are they performing in furtherance of" UN sustainability goals. (Trial Tr. 512–13.) Nor would testimony from UNGSII President Roland Schatz that UNGSII is "a private foundation" have, as noted, added any clarity to the key issues in the case. (ECF 135 at 50.) The Court is thus unmoved by Saint Clair's contention that the joint venture document "tend[s] to rebut the Government's claims of '[n]o UN relationship[.]'" (Id. at 34.)

Counsel also did not seek to admit into evidence a photograph of the UNMAS award Saint Clair received on behalf of WSA related to WSA's donation of soccer turf. Again, evidence relating to the award was presented at trial through Mia Saint Clair, who testified that

[3] Buza quoted from DX 2, the so-called Rabat Declaration, which in turn referred to UN-NGO-IRENE's role in WSA's origin.

Saint Clair accepted the award inside UN headquarters, (Trial Tr. 808), and Saint Clair himself, who testified about a photo depicting an exhibit of "a miniature soccer field" that he was involved in installing in the UN headquarters lobby, (Trial Tr. 910–11 (describing DX 17)). The timing of the award also casts doubt on its exculpatory value. Saint Clair testified that he received the award in mid-2019. (Trial Tr. 922.) But investors had given funds to Saint Clair as a result of the fraud in 2017 and 2018. In sum, the failure to offer an image of the award itself is unlikely to have prejudiced Saint Clair.

## III. Claim of Actual Innocence

In reliance on his preferred interpretation of the trial evidence and the submissions on his motion that the Court has already concluded are speculative, cumulative, immaterial, or otherwise inadmissible, Saint Clair claims he is actually innocent. "Actual innocence" may be asserted to raise serious constitutional questions that otherwise would be procedurally barred under section 2255. See, e.g., Thorn, 659 F.3d at 231. It is not, however, considered a freestanding basis for relief. And in any event, given the testimony of government witnesses—unrebutted in this motion—that Saint Clair induced them to enter transactions through his representation that WSA was affiliated with the UN, coupled with Saint Clair's own testimony—unrebutted in this motion—that such a statement would be untrue, he cannot claim that he has demonstrated actual innocence on this motion.

## IV. No Hearing is Necessary

No hearing on the motion is necessary because, stripped of legal labels and conclusions, Saint Clair's arguments can be assessed based solely on his own submissions. See

United States v. Malcolm, 432 F.2d 809, 812 (2d Cir. 1970) (explaining that a court need not hold a hearing "where the allegations [in a section 2255 motion] are insufficient in law, undisputed, immaterial, vague, conclusory, palpably false or patently frivolous"); Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003) ("It is within the district court's discretion to determine whether a hearing is warranted.").

Saint Clair's submissions are premised on purportedly mistaken decisions about who to call as a witness, how to examine, what to offer into evidence, and what to argue to the jury. These, however, were strategic decisions trusted to trial counsel's judgment, and Saint Clair could not have been materially prejudiced because the forgone arguments, evidence, and testimony he raises are unlikely to have overcome the strong evidence of his guilt. It was Saint Clair's burden to overcome the presumption of regularity accorded to his trial lawyer's performance. See Strickland, 466 U.S. at 689. He has not done so, and his arguments are without merit. Whether a lawyer's performance falls below an objective standard of reasonableness is not determined by the degree to which the lawyer's decisions were in conformity with the client's wishes. Nor has Saint Clair raised any factual issues that must be resolved in a hearing.

## V. Post-Reply Submissions of Saint Clair

The Court set a schedule for briefing on Saint Clair's section 2255 motion. In accordance with the schedule, Saint Clair submitted a reply memorandum together with his own declaration. With that submission, the briefing was closed. No other submission was authorized by this Court. There are occasions that warrant further submissions with leave of the Court. If

that course is warranted, the Court may grant leave for further submission. But Saint Clair has bombarded the docket at will with unauthorized submissions.

In addition to Saint Clair's section 2255 motion and his declaration and reply to the government's submission (ECF 135, 150 & 151), Saint Clair has submitted (1) a motion to strike Buza's declaration (ECF 149); (2) proposed findings of fact and conclusions of law (ECF 152); (3) a motion for vacatur of his conviction with an accompanying declaration and memorandum (ECF 153, 154 & 155);[4] (4) a motion to stay execution of his remaining sentence with a declaration, request for expedited consideration, and a letter requesting a ruling (ECF 156, 157, 158 & 163);[5] (5) a "Notice of Supplemental Evidence" stating that a prosecutor in the case against him had joined the firm in which the undersigned had been a partner until October 31, 2003 (ECF 159);[6] (6) a letter requesting an evidentiary hearing and clarification of "the scope of" the Court's denial of the motion for vacatur, and a memorandum of law and declaration in support (ECF 164, 165 & 166); (7) a "Notice of Supplemental Evidentiary Items Relating to Ground Five" of the request for an evidentiary hearing (ECF 167); (8) a "Notice of Supplemental Document Clarification relating to Ground Four" (ECF 168); (9) a "Notice of Supplemental Document Clarification Relating to Ground Seven" (ECF 169); (10) a "Clarification for Hearing on Ground Five, Part II – FINRA Evidence" with a declaration by Saint Clair (ECF 170); (11) "Memorandum of Law in Support of Ground Eight and Request for Evidentiary Hearing" with a declaration by Saint Clair (ECF 171); (12) a letter informing the Court that while Saint Clair had completed "filings relating to [his] hearing request," he "expressly reserve[s] all rights

[4] The motion was denied. (ECF 160.)
[5] The motion was denied. (ECF 161.)
[6] While the undersigned cannot discount the possibility that he has exchanged pleasantries with the individual at a public event, he had no conversations regarding her decision to join the law firm or the substance of this case. The undersigned left the particular law firm over twenty-two years ago.

with respect to every other ground raised in [his] § 2255 motion" (ECF 172); (13) "Declaration of Asa Saint Clair – Ground Five Pt. I" (ECF 173); (14) a "Notice of Supplemental Document Clarification Relating to Ground Five" (ECF 174); (15) a notice of supplemental authority relating to the 2255 motion and a letter to the Court correcting a technical error in that notice (ECF 175 & 176); (16) "Supplemental Clarification: Ground Five, Part III" (ECF 177); (17) a motion for the disclosure of grand jury materials, numerous declarations and memoranda in support, and notices of those filings (ECF 178, 179, 180, 181, 182, 183, 184, 185, 186, 188, 189, 190, 191, 192, 193, 194, 195, 196 & 197); (18) a letter informing the Court that the motion for grand jury materials is unopposed and explaining the necessity of making many separate filings (ECF 187); (19) a letter informing the Court that the motion for grand jury materials has been fully submitted (ECF 198); (20) a declaration by Roland Schatz (ECF 199); (21) a notice of intent to file a motion alleging fraud upon the court with memoranda, an exhibit, and a declaration in support (ECF 200, 202, 203, 204 & 205); and (22) a "Notice of Correction" relating to citations in earlier filings (ECF 201).

The Court has considered the supplemental authority cited to this Court (ECF 175).[7] The Court has already denied the motions for immediate vacatur of conviction and for a stay of the remaining portion of Saint Clair's sentence. (ECF 160 & 161.)

The Court has also considered Saint Clair's submissions relating to release or in camera review of grand jury materials and denies the motion as it is nothing more than a fishing expedition premised upon largely the same grounds he raised in his claims of ineffective assistance of counsel. A court may authorize such disclosure under certain circumstances

[7] The purported authority is excerpts from the oral argument in United States v. Hemani, 146 S. Ct. 1677 (2026) (argued Mar. 2, 2026 and decided June 18, 2026). The Court has considered whether Hermani has any impact on the outcome of this motion and concludes that it does not.

pursuant to Rule 6(e)(3)(E)(i), Fed. R. Crim. P. "Under that rule, the burden is on the movant to demonstrate a 'particularized need' for disclosure that is (1) necessary to avoid a 'possible injustice in another judicial proceeding'; (2) 'greater than the need for continued secrecy'; and (3) 'structured to cover only material so needed.'" Bourne v. United States, 21-2497, 2023 WL 3102700, at *1 (2d Cir. Apr. 27, 2023) (summary order) (quoting Douglas Oil Co. of California v. Petrol Stops Northwest, 441 U.S. 211, 222 (1979)). Saint Clair fails to meet this burden.

Saint Clair's request is not, as he contends, "narrowly tailored." He asks for (1) "[w]itness transcripts;" (2) "[d]ocuments or exhibits shown to the grand jury;" (3) "[a]ny summaries or proffers presented by the Government;" (4) "[l]egal instructions regarding 'affiliate,' UN affiliation, contractual authority, relocation, FINRA, and wire-fraud elements;" (5) "any agent summaries, 302s, or notes memorializing [Tijero's] statements;" (6) "any proffer notes or records of [Tijero's] 10–14 meetings with prosecutors;" (7) "any instructions, guidance, or factual representations given to the grand jury regarding Petitioner's UN involvement[;]" (8) "grand-jury materials relating to . . . [t]he WSA cryptocurrency by either name; iGObit or GUMMEE Coin;" (9) materials relating to the "GX 1630 text message;" (10) materials relating to "PX 198, PX 199, and ECF 73-1[;]" (11) "any representations concerning pre- or post-search crypto development[;]" (12) "[a]ll grand-jury transcripts or notes referencing or relating to Petitioner's employment and compensation[;]" (13) "[a]ny exhibits or pages of employment or appointment contracts shown to the grand jury[;]" and (14) "[a]ny prosecutor statements or witness testimony describing Defendant's authority to receive payments, compensation, reimbursements, or expenditures." (ECF 178 at 7; ECF 185 at 13; ECF 191 at 9; ECF 193 at 5.)

Saint Clair also fails to articulate a "particularized need" for the requested materials to avoid "a possible injustice" in the review of his section 2255 motion. Saint Clair

wishes to know whether the grand jury was told erroneously that he never disclosed his Arizona residence during his bail determination and that "the closest he got to the UN was having an apartment office across the street." As explained, the former issue is immaterial, and the latter was a figure of speech in the government's closing argument that caused him no prejudice. (See Trial Tr. 1087.)

The "inconsistencies" Saint Clair identifies in certain witnesses' trial testimony are either insignificant or not really inconsistencies at all. (See ECF 180 at 8–9; ECF 185 at 2–3.) For example, Saint Clair urges that Tijero contradicted himself on cross examination with respect to Saint Clair's "involvement" with the UN. (ECF 185 at 2–3.) Tijero testified on direct that he had not been aware of Saint Clair meeting or communicating with "anyone that worked for the United Nations[.]" (Trial Tr. 442.) He testified on cross that he had seen Saint Clair meeting with Roland Schatz and that he and Saint Clair once "sat in on" a conference inside the UN, during which Saint Clair "had a moment" to address the audience. (Trial Tr. 511–513.) But Schatz's professional relationship with Saint Clair ran through UNGSII, not Schatz's role as advisor to Michael Møller, (see ECF 135 at 49–60), and addressing conference-goers is distinct from meeting or communicating with anyone that worked for the UN.[8] Saint Clair's concern with which "versions" of the testimony the grand jury was told is thus misplaced. Saint Clair's complaints with respect to the FINRA stipulation are also misplaced, as the stipulation was not created by the parties until after the Superseding Indictment was filed. (See ECF 62 & 71.)

Saint Clair premises his request for grand jury materials on the additional claim that the government committed a Brady violation by withholding a GUMMEE white paper dated

[8] To the extent Saint Clair is attempting to separately claim a violation of 18 U.S.C. § 3500 due to his purported failure to receive any material concerning Tijero's statements to the government, (see ECF 186 at 1), he has procedurally defaulted on that claim. See Thorn, 659 F.3d at 231.

September 26, 2019. (ECF 191 at 7–8.) In Saint Clair's telling, the date of the white paper undermines the government's claim that Saint Clair sped up work on GUMMEE to hide his earlier deception of investors, as the white paper was created "weeks prior to" the government's search of WSA's offices. (ECF 192 at 1.) The simple fact that there was a GUMMEE white paper being developed prior to the search, however, does little to rebut the government's assertion that "the momentum only takes off on GUMMEE" after the August 2019 text about Saint Clair's business associate being referred for charges. (Trial Tr. 1055; see GX 1630.) Access to grand jury materials will therefore not be granted on the basis that "the grand jury may have received an incomplete or false timeline." (See ECF 191 at 9.)

That the "grand jury disbanded years ago" cannot overcome these defects. (See ECF 190 at 7.) "Moreover, an error in a grand jury proceeding is generally considered harmless once a defendant has been convicted at trial after a jury has found that defendant guilty of crimes charged in the indictment beyond a reasonable doubt." Chacko v. United States, 04-cv-2258, 2005 WL 1388723, at *6 (S.D.N.Y. June 8, 2005) (Koeltl, J.) (citing United States v. Mechanik, 475 U.S. 66, 70 (1986)).

Another of Saint Clair's supplemental submissions is a recently filed motion alleging fraud upon the court. In that motion, Saint Clair largely recycles arguments presented in conjunction with his claims of government misconduct and ineffective assistance of counsel. For the same reasons these arguments failed as government misconduct and ineffective assistance of counsel claims, they fail under Saint Clair's new chosen label.

CONCLUSION

The Court has considered the entirety of Saint Clair's arguments, including those arguments not expressly addressed herein, and finds them to be without merit. His motion to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255 is DENIED. All other relief is denied.

The Clerk is directed to terminate the motions at ECF 135, 158, 171, 178, 181, and 203 in 19 Cr. 790 and close 19 Cr. 790 and 25 Civ. 1046.

Saint Clair has not made a substantial showing of the denial of a constitutional right, and accordingly, a certificate of appealability will not issue. 28 U.S.C. § 2253; see Blackman v. Ercole, 661 F.3d 161, 163–64 (2d Cir. 2011). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

Dated: New York, New York
July 23, 2026

P. Kevin Castel
United States District Judge

MAILED TO:
Asa Saint Clair
817 14th Way SW
Edmonds, WA 98020